UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TOWN OF GRAFTON, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> PULTE HOMES OF NEW ENGLAND, LLC, ) <br> and HILLTOP FARMS DEVELOPMENT, LLC, ) <br> ) <br> Defendants. ) <br> ) | CIVIL ACTION <br> No. 12-cv-10524-TSH |

**ORDER**
**March 29, 2013**

HILLMAN, D.J.

### INTRODUCTION

Plaintiff Town of Grafton has sued Pulte Homes of New England, LLC and its subsidiary Hilltop Farms Development, LLC (collectively, "Defendants") for the payment of excess profits due from a Chapter 40B housing development. Pending before the Court is Defendants' Motion to Dismiss Plaintiff's First Amended Complaint under Fed. R. Civ. P. 12(b)(6) (Docket No. 12). The Court took this action under advisement after holding a motion hearing on September 29, 2012. For the reasons set forth below, the motion is **DENIED**.

### FACTUAL BACKGROUND

The Court sets forth the facts necessary for the disposition of this motion in the following manner:

**1. Chapter 40B**

Enacted in 1969, the Comprehensive Permit Act or "Chapter 40B" under Mass. Gen. Laws. ch. 40B, §§ 20-23 was designed to incentivize local municipalities and developers to provide affordable housing to low- and moderate-income families across the Commonwealth. *See Town of Hingham v. Dep't of Hous. & Cmty. Dev.*, 451 Mass. 501, 502 (2008). Chapter 40B defines "affordable housing" as: "any housing subsidized by the federal or state government under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute, whether built or operated by any public agency or any nonprofit or limited dividend organization." Mass. Gen. Laws ch. 40B, § 20. "The statute reflects the Legislature's considered judgment that a crisis in housing for low and moderate income people demands a legislative scheme that requires the local interests of a town to yield to the regional need for the construction of low and moderate income housing, particularly in suburban areas." *Standerwick v. Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 29 (2006). Thus, Chapter 40B establishes a quid pro quo-like relationship between developers and municipalities. *See, e.g.*, *Dennis Hous. Corp. v. Zoning Bd. Of Appeals of Dennis*, 439 Mass. 71, 76-78 (2003).

**2. The Parties**

Pulte Homes, Inc./PulteGroup, Inc., operating as Pulte Homes of New England, LLC ("Pulte") in this litigation, designs and builds residential housing developments across the United States and maintains a principal place of business in Bloomfield Hills, Michigan. Am. Compl. ¶ 7; Ex. B to Am. Compl., at 2 (Docket No. 7-2). Pulte's wholly-owned subsidiary, Hilltop Farms Development, LLC ("Hilltop"), was incorporated in Delaware and created for the singular purpose of constructing "Hilltop Farms," a 256-unit residential development located on Milford Road in the Town of Grafton (the "Project"). Am. Compl. ¶¶ 1, 8; Ex. A to Am. Compl., at 1 (Docket No. 7-1). At all times relevant to the instant action, Defendants maintained identical

principals. Am. Compl. ¶ 89. The Town of Grafton (the "Town"), by and through its Zoning Board of Appeals ("ZBA"), is a municipality incorporated in Worcester County, Massachusetts. Am. Compl. ¶ 9.

### 3. The Project

Affordable housing builders typically use institutional lenders to finance the construction of developments. Ex. B to Am. Compl., at 4. On August 13, 2001, Hilltop received a "Project Eligibility/Site Approval Letter" from one such lender, Salem Five Cents Savings Bank (the "Bank"). *Id.* The letter expressed the Bank's and Hilltop's position that the Project qualified for a loan from the New England Fund ("NEF") maintained by the Federal Home Loan Bank of Boston ("FHLBB") which provides fixed-rate federally subsidized loans to projects aimed at community development. Am. Compl. ¶¶ 23-24. Hilltop then used the Bank's letter to support its application for a Chapter 40B comprehensive permit from the Town's ZBA. Ex. B to Am. Compl., at 4. On January 30, 2003, the Town's ZBA approved the comprehensive permit which allowed Hilltop to begin construction in June, 2004. Am. Compl. ¶¶ 10, 13.

The parties executed several agreements prior to construction. First, on March 25, 2004, Hilltop executed a Monitoring Services Agreement ("MSA") with the Citizens' Housing and Planning Association ("CHAPA") wherein CHAPA, a non-profit housing advocacy group, agreed to monitor and enforce Hilltop's compliance with both the percentage of units allocated for "affordable housing" and the cap on allowable profits. Ex. A to Am. Compl., at 18-19. Second, on June 28, 2004, Hilltop entered into a Regulatory Agreement ("RA") with the Bank that memorialized the parties' understandings of their respective responsibilities in conjunction with Chapter 40B. *Id.* at 1. Specifically, Hilltop agreed to make available twenty-five percent (25%) of the total units to buyers earning less than eighty percent (80%) of the local median

3

income and agreed to cap all Project-related profits at twenty percent (20%) of total cost and remit any excess to the Town. *Id.*; Am. Compl. ¶¶ 10-11. With respect to how the mandatory profit cap or "dividend limitation" was calculated in relation to cost, Section 4 of the RA states in pertinent part:

> Dividend Limitation: (a) Developer agrees that the profit to the Developer or to the partners, shareholders, or other owners of Developer or of the Project shall not exceed twenty percent (20%) of certified development cost, net of related party transactions of the project of the project ("Allowable Profit").
>
> (b) Upon issuance of a final certificate of Occupancy for all of the unites in the Project, the Developer shall deliver to the Monitory Agent an itemized statement of total development costs together with a statement of gross sales revenues from the Project received by the Developer to date certified by the Developer ("Certified Cost and Income State"). . . .
>
> (c) All profits from the Project in excess of the Allowable Profit shall be paid by the Developer to the Municipality. . . .
>
> (d) The Allowable Profit shall be measured as the excess of certified income, less any brokerage fees and commissions and selling expenses over certified costs and less all development costs related to the Project including costs incurred by the developer as administrative and overhead expenses which do not exceed four percent (4%) of total development costs, excluding such administrative and overhead costs. Acceptable development costs include, but are not limited to, the cost of site acquisition, defined as the land value which can be underwritten by the Project and which can be supported by the subsidizing entity's appraisal upon which its construction loan is based.

Ex. A to Am. Compl., at 3. Although not a signatory to either the MSA or RA, Grafton is a third-party beneficiary of the RA. *Id.* at 7, 22. The Project was finished in 2007. Am. Compl. ¶ 13.

After unit-sales were complete, the RA required that Hilltop submit to CHAPA a "Certified Cost and Income Statement" reporting all revenue, costs and profit. *Id.* ¶ 14. McGladrey & Pullen, LLC, Hilltop's auditor on the Project, issued its cost certification report on February 11, 2008 (the "McGladrey Report"). *Id.* The McGladrey Report concluded that the Project's total revenue was $75,830,641, total cost was $66,055,688 and net profit percentage

based on development costs was approximately fifteen percent (15%). Ex. B to Am. Compl., at 15. Thus, under the RA, Hilltop had not exceeded the 20% profit cap and thus owed no excess profits to the Town. Am. Compl. ¶ 15. Hilltop then submitted the McGladrey Report to CHAPA and its auditor Daniel Dennis & Company, LLP for review. *Id.* ¶¶ 16-17. On July 3, 2008, CHAPA, basing their calculations solely on the numbers assembled by the McGladrey Report, concurred that the 20% profit cap had not been exceeded. *Id.* ¶ 18.

### 4. The Inspector General's Report

Based on a series of investigations of other Chapter 40B developments in the state, which discovered that developers had padded costs and shielded profits from municipalities,[1] Massachusetts Inspector General Gregory W. Sullivan ("IG") reviewed the McGladrey Report and found several inconsistencies in Hilltop's (and by extension, Pulte's) accounting of the Project. *Id.* ¶¶ 19-20. On November 7, 2011, the IG filed a comprehensive report ("IG Report") concluding that Defendants, through various accounting practices, had concealed between $8 million and $17 million in profits due to the Town. *Id.* ¶¶ 20-21; Ex. C to Am. Compl., at 1-3 (Docket No. 7-3).

The IG Report uncovered four areas of the Defendants' cost evaluations that were deficient:

### (a) *Land Acquisition Cost*

Hilltop acquired the Project's Milford Road property for $900,000 on January 6, 2004. Am. Compl. ¶ 26. The IG Report, however, alleged that the McGladrey Report used an inflated cost calculation by carrying an acquisition cost of $7.8 Million based on the hypothetical fair market value of the property if it were to include a comprehensive permit. *Id.* ¶¶ 28, 32.

---

[1] The IG investigations uncovered approximately $100 Million in concealed profits owed to local municipalities. *Id.* ¶ 19.

Applying a land appraisal value that includes a comprehensive permit would violate guidelines for approving such permits under 760 C.M.R. 31.00 *et seq.*, also known as *Guidelines for Housing Programs in Which Funding is Provided Through a Non-Governmental Entity* ("NEF Guidelines"). *Id.* ¶¶ 29-30. Specifically, under the guidelines "[e]conomic benefits of the comprehensive permit shall accrue to the development and *shall not be used to substantiate an acquisition cost* that is unreasonably greater than fair market value under existing zoning." *Id.* ¶ 31. Finally, the IG Report noted "the developer utilized the most liberal interpretation of the RA terms that would provide it with the highest monetary benefit" and thus owed the difference of approximately $6.9 Million to the Town. *Id.* ¶¶ 34-35.

**(b)** *Accrued Expenses*

The IG Report found deficiencies in Hilltop's general ledger accounts for "accrued expenses" under the Project. *Id.* ¶ 38. Specifically, Hilltop carried cost expenditures of $818,527, however, it neither accounted for nor documented corresponding cash dispersals that would verify whether those expenditures were actually paid out. *Id.* ¶¶ 39-40.

**(c)** *Administrative and Overhead Costs*

Section 4(a) of the RA prohibited Hilltop from claiming any "related party transactions of the project" and capped Hilltop's administrative and overhead costs at four percent (4%) of the total development cost under Section 4(d). *Id.* ¶¶ 42-43. Furthermore, only "the developer" of the Project could incur administrative and overhead costs, not another party. *Id.* ¶ 46. The McGladrey Report certified that Hilltop carried costs of $2,540,603. *Id.* ¶ 40. Contrary to both the McGladrey Report and the terms of the RA, however, the IG Report noted that it was in fact Pulte who incurred and was reimbursed for these costs as opposed to Hilltop. *Id.* ¶¶ 41, 46-47. Thus, Pulte, not Hilltop, acted as the de facto "developer" of the Project. *Id.* ¶ 47.

**(d)** *Construction Costs*

The McGladrey Report stated that "affiliates of [Hilltop] provided development and construction services to [Hilltop] . . . Only reimbursed expenses were paid to these affiliates for services performed." *Id.* ¶ 51. Although Hilltop signed the RA as the "developer," The IG Report found that Pulte acted as "general contractor" and was reimbursed for $38 Million in construction costs. *Id.* ¶ 55. Nevertheless, the IG Report faulted Hilltop for attributing project costs reimbursed to its parent company Pulte while "related party" transactions, such as the construction reimbursements, were expressly prohibited from cost evaluations under the RA. *Id.* ¶¶ 54, 56.

### THE 12(B)(6) STANDARD

To survive a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a complaint must evince the requisite factual detail to establish a *plausible* claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009). When deciding a motion to dismiss, the court is obligated to accept all of the facts alleged in the complaint as true, however, plaintiff still carries the burden of directing the court to the appropriate substantive law that entitles it to the relief it seeks. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007); *Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000).

### ANALYSIS

The Amended Complaint (Docket No. 7) advances nine causes of action in tort, contract and statute: Count I (Breach of Contract); Count II (Breach of Fiduciary Duty) Count III (Conversion); Count IV (Violation of Mass. Gen. Laws ch. 93A); Count V (Common Law Fraud); Count VI (Unjust Enrichment); Count VII (Civil Conspiracy); Count VIII (Aiding and

Abetting Breach of Fiduciary Duty); Count IX (Accounting). Although Defendants advance compelling arguments in their favor that in many ways directly rebut the Town's allegations, these arguments are best left for disposition at summary judgment. Nevertheless, at this juncture the evidence set forth in the Amended Complaint and the exhibits attached thereto satisfies the plausibility standard articulated in *Twombly* and *Iqbal* for each of the Town's causes of action.

## CONCLUSION

Accordingly, for the reasons set forth above I hereby **DENY** Defendants' Motion to Dismiss.

SO ORDERED.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**